IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Joani Rankin, | ) | C/A No.: 1:19-1195-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul,[1] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Bruce Howe Hendricks, United States District Judge, dated April 26, 2019, referring this matter for disposition. [ECF No. 8]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 7].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIB") and Supplemental Security Income

---

[1] Andrew M. Saul became the Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Fed. R. Civ. P. 25(d), Saul is substituted for Nancy A. Berryhill.

("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.     Relevant Background

A.     Procedural History

On October 20, 2015, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on March 21, 2013. Tr. at 102, 103, 205–06, 207–14. She subsequently amended the onset date to July 3, 2015. Tr. at 43. Her applications were denied initially and upon reconsideration. Tr. at 133–37, 144–47, 148–51. On January 31, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Flora Lester Vinson. Tr. at 39–83 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 16, 2018, finding Plaintiff was not disabled within the meaning of the Act. Tr. at 7–31. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 25, 2019. [ECF No. 1].

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 31 years old at the time of the hearing. Tr. at 44. She graduated high school with a diploma and obtained a certificate as a certified nursing assistant ("CNA"). Tr. at 45. Her past relevant work ("PRW") was as a tire molder, a production line assembler, and a material handler. Tr. at 75–76, 79. She alleges she has been unable to work since July 3, 2015. Tr. at 231.

2.      Medical History

On April 5, 2012, magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine showed disc protrusions at L4–5 and L5–S1 with mass effect on the transitioning nerve roots. Tr. at 357.

Plaintiff presented to neurosurgeon Brett C. Gunter, M.D. ("Dr. B. Gunter"), for pain in her left hip and leg and lower back on April 17, 2012. Tr. at 352. She reported pain that had occurred intermittently beginning in 2008, but had become constant in January 2012. *Id.* She described her pain as occurring in her back 20% of the time and in her left hip and leg 80% of the time. *Id.* She stated her back pain was exacerbated by sitting and lying on her left side. *Id.* She described her left hip and leg pain as worsened by bending, lifting, standing too long, walking, and twisting. *Id.* Dr. B. Gunter observed mild reduction in range of motion ("ROM") in all cardinal planes of Plaintiff's back, intact cranial nerves, 5/5 strength in the upper and lower

3

extremities, intact sensation to light touch, and symmetric and intact upper and lower extremity reflexes. Tr. at 352–53. He noted Plaintiff walked with a limp favoring her left leg. *Id.* Dr. B. Gunter reviewed results of the MRI of Plaintiff's lumbar spine and assessed lumbar spondylosis with an L5 radiculopathy. Tr. at 353. He prescribed Norco, recommended a lumbar epidural steroid injection ("ESI"), and indicated Plaintiff would likely require surgery if the ESI provided no relief. *Id.* Steven B. Storick, M.D. ("Dr. Storick"), administered a lumbar ESI on April 25, 2012. Tr. at 354.

On May 8, 2012, Plaintiff reported little benefit from the lumbar ESI. Tr. at 350. Dr. B. Gunter noted Plaintiff's left hip and leg pain remained severe despite conservative management. *Id.* He observed reduced ROM in Plaintiff's back and reduced sensory function over the posterior aspect of her lower extremities. *Id.* He advised Plaintiff of treatment options, and Plaintiff opted to proceed with surgery. *Id.*

Dr. B. Gunter performed minimally-invasive lumbar discectomy at Plaintiff's left L4–5 level on May 24, 2012. Tr. at 337–38. He identified and removed a large, contained, left L4–5 herniated disc without difficulty and accomplished good decompression without spinal fluid leak. Tr. at 338.

On June 19, 2012, Plaintiff reported pain in her right hip and heaviness in her right arm, but indicated her left-sided symptoms had improved. Tr. at 349. Dr. B. Gunter observed reduced ROM in Plaintiff's

back, a well-healed surgical scar over the lumbar spine, and 5/5 strength throughout her lower extremities. *Id.* He indicated he was concerned about Plaintiff's new right upper extremity symptoms, but noted they could be transient. *Id.* He referred Plaintiff for lumbar physical therapy with development of a home exercise program. *Id.*

Plaintiff presented to physical therapist Shannon B. Berrian ("PT Berrian"), for an initial physical therapy evaluation on June 21, 2012. Tr. at 340. She reported she was no longer experiencing pain in her left lower extremity, but continued to feel right-sided back pain. *Id.* She described her pain as constant and rated it as a five-to-six of 10. *Id.* She endorsed difficulty sleeping because of pain. *Id.* PT Berrian noted decreased lumbar lordosis, normal gait, 5/5 knee and ankle strength, 4/5 hip strength, intact sensation to light touch in the bilateral lower extremities, and tenderness to palpation at L4–5. Tr. at 341. Plaintiff endorsed pain and tightness with forward flexion and back pain with trunk extension. *Id.* PT Berrian expected Plaintiff would "benefit from physical therapy to improve functional strength and mobility and decrease complaints of pain." *Id.* She indicated Plaintiff should follow up three times a week for four weeks. *Id.* PT Berrian discharged Plaintiff from physical therapy on July 13, 2012, based on inconsistent attendance interfering with goal accomplishment. Tr. at 339. She noted Plaintiff had

"[n]o-showed" for three consecutive appointments and had missed six total appointments. *Id.*

On July 31, 2012, Plaintiff reported mild pain in her lower back and greater pain on her right side. Tr. at 348. She indicated her strength remained normal. *Id.* Dr. B. Gunter observed reduced ROM in Plaintiff's back and 5/5 strength throughout her lower extremities. *Id.* He stated Plaintiff was "much better and may return to work full time and full duty at completion of her two weeks of lumbar physical therapy and home exercise program." *Id.*

Plaintiff presented to Gurdon Counts, M.D. ("Dr. Counts"), with back pain on March 11, 2013. Tr. at 406. She described pain in her buttocks and thighs, but denied joint complaints, joint erythema, joint swelling, myalgias, and stiffness. *Id.* She indicated her back pain was interfering with her abilities to sleep and work. *Id.* Dr. Counts observed an overall benign spine with some tenderness in the lumbar area, but good posture, normal straight-leg raise, and full flexion, extension, lateral bending, and rotation. *Id.* He assessed degenerative lumbar/lumbosacral intervertebral disc and prescribed Diclofenac Sodium 75 mg and Ultram 50 mg. *Id.*

On March 26, 2013, Plaintiff sought clarification from Dr. Counts as to her ability to perform work activity. Tr. at 403. Dr. Counts noted Plaintiff's job required "[s]he constantly lift[] 10 to 20 lb bobbins and drive[] fork lift and

other machinery." *Id.* Plaintiff reported the vibrations of the machinery caused her back pain. *Id.* She stated she would lie down after work to relieve discomfort. *Id.* Dr. Counts noted that Plaintiff's neurosurgeon had released her to full duty. *Id.* He provided a note stating Plaintiff was "unable to continue the present pace of work," but explained he did not consider "assessing her competence to continue [the] job" to be within his area of expertise. *Id.*

On April 23, 2013, Plaintiff endorsed intermittent pain in her lower back and constant pain in her bilateral buttocks and hips. Tr. at 346. Dr. B. Gunter observed the following: mild reduction of ROM in all cardinal planes of Plaintiff's back; 5/5 strength in her bilateral upper and lower extremities; mild reduction in light touch sensation over the right posterior and anterior thigh, anterolateral lower leg, and dorsum of the right foot; and symmetric and intact upper and lower extremity reflexes. Tr. at 346–47. He recommended an MRI of the lumbar spine to evaluate for nerve root compression and lumbar x-rays to evaluate for instability. Tr. at 347. He prescribed Norco for pain and indicated Plaintiff should remain out of work. *Id.*

On June 25, 2013, Plaintiff complained of back pain and consulted with Dr. Counts about medical leave from work and obtaining a new MRI. Tr. at 398. She endorsed back pain and leg pain, primarily on the right. Tr. at 399.

Dr. Counts noted tenderness in Plaintiff's lumbar spine, but full flexion, extension, rotation, and lateral bending and normal straight-leg raise. *Id.* He provided a "[n]ote for light duty X 6 mo. No lifting [or] bending." *Id.*

Plaintiff presented to Dr. Counts for medication refills on January 8, 2014. Tr. at 394. She complained of stiffness and pain in her low back and hips. *Id.* Dr. Counts noted tenderness in Plaintiff's lumbar spine, but full extension, lateral bending, and rotation and normal straight leg raise. *Id.* He assessed degeneration of the lumbar/lumbosacral intervertebral disc and prescribed Flexeril 10 mg. *Id.*

Plaintiff reported depression, sore throat, and hoarseness on March 31, 2014. Tr. at 375. Dr. Counts assessed pharyngitis, degenerative disease of the lumbar and intervertebral discs, and depression. Tr. at 376. He prescribed Wellbutrin SR 150 mg for depression. *Id.*

On May 5, 2014, Plaintiff presented to Dr. Counts for treatment of back pain. Tr. at 375. She indicated she was enrolled in a certified nursing assistant program and needed a letter to address her lifting ability. *Id.* Dr. Counts wrote: "I will give not[e] that she is able to lift 25 lbs—transfer and position clients but she is not to lift heavy c[l]ients without help." *Id.*

On November 19, 2014, Plaintiff requested Dr. Counts complete paperwork for her long-term disability benefits. Tr. at 373. She indicated she had contacted Dr. B. Gunter to request a referral for an updated MRI, but no

longer had insurance. *Id.* She stated she was taking classes and working toward a job in the medical field. *Id.* Plaintiff endorsed back pain with radiation to her legs and feet that was aggravated by walking or driving for more than 30 minutes. *Id.* Dr. Counts observed Plaintiff to be tender on motion of the back and to demonstrate a negative straight-leg raise. *Id.*

On July 3, 2015, Plaintiff reported feeling well. Tr. at 371. Dr. Counts observed no abnormalities on exam and noted 5/5 muscle strength, "no tenderness to palpation" of the lumbar spine, "no pain, no swelling, edema or erythema of surrounding tissue and normal lumbosacral spine movements." Tr. at 372. He prescribed Flexeril 10 mg and Ibuprofen 600 mg. *Id.*

On September 14, 2015, Plaintiff presented to Lexington Medical Center for an abscess on her neck and pain in her back and legs. Tr. at 416. She described chronic pain in her lower back that radiated into her legs with occasionally numbness and tingling. *Id.* She stated her pain was aggravated by movement. *Id.* Patrick M. O'Malley, M.D. ("Dr. O'Malley"), noted diffuse lumbar tenderness, but no midline or costovertebral angle tenderness in Plaintiff's spine. Tr. at 417. He assessed an infected sebaceous cyst and chronic lumbar radiculopathy. *Id.* He prescribed Hydrocodone-Acetaminophen 5-325 mg and Prednisone 20 mg for lumbar radiculopathy. *Id.*

On January 4, 2016, Plaintiff presented to Jeffery C. Ford, M.D. ("Dr. Ford"), for a consultative exam. Tr. at 423–26. She endorsed problems with bladder control, back injury, herniated disc, degenerative disc disease, and osteoarthritis. Tr. at 423. She described pain that "waxe[d] and wane[d]" and radiated into her right leg and down to her toes. *Id.* She stated it was sometimes a "shooting pain" and somtimes a "pressure-like" pain. *Id.* She reported abilities to stand for 30 minutes, walk a few miles, get in and out of a bathtub, use the toilet, perform housework, cook, dress, groom, and lift approximately 15 pounds. *Id.* She complained of urinary incontinence that sometimes occurred upon sitting for half an hour. *Id.* She denied fatigue and excessive daytime sleepiness. Tr. at 424. Dr. Ford observed Plaintiff to demonstrate no difficulty moving from the seated to supine position or the seated to standing position. *Id.* He indicated Plaintiff demonstrated full ROM of all joints, but that right hip maneuvers caused pain in her back. Tr. at 420, 426. He noted Plaintiff had no muscle wasting or joint deformity and was able to fully squat. *Id.* He indicated Plaintiff demonstrated intact cranial nerves and intact muscle strength in most areas, but 4/5 strength in her right lower extremity. Tr. at 421, 426. He noted 1+ peripheral pulses in Plaintiff's bilateral lower extremities. Tr. at 421. He stated Plaintiff showed sciatic pain on the right on straight-leg raise. Tr. at 426. He noted Plaintiff had normal gait and was able to perform tandem, heel, and toe walks. *Id.* He described

Plaintiff as having normal speech and affect. *Id.* Dr. Ford indicated x-rays showed some narrowing of the L4–5 and L5–S1 disc spaces and minimal scoliosis. *Id.* He assessed degenerative disc disease, sciatica, and urinary incontinence. *Id.*

On January 28, 2016, state agency medical consultant Robert Kukla, M.D. ("Dr. Kukla"), reviewed the record and completed a physical residual functional capacity ("RFC") assessment that included the following restrictions: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; and sit for a total of about six hours in an eight-hour workday. Tr. at 89–90, 98–99. State agency consultant Jeanne Wright, Ph.D. ("Dr. Wright"), reviewed the record and concluded Plaintiff's record did not establish a medically-determinable mental impairment. Tr. at 97.

Plaintiff presented to Batesburg Mental Health ("BMH") on April 26, 2016, with complaints of increased depressive symptoms including increased crying spells and decreased energy, motivation, sleep, and concentration. Tr. at 448. She reported conflict with her sister and endorsed passive suicidal thoughts with no plan. Tr. at 448–49. Counselor Janine Bryan discussed with Plaintiff signs and symptoms of depression, listened, and offered empathy. Tr. at 455.

Plaintiff presented to BMH for an initial clinical assessment on May 9, 2016. Tr. at 451–54. She reported depressive episodes, withdrawal from her family, loss of concentration, sleep disturbance, and lack of appetite. Tr. at 451. Counselor Ginavra Gibson ("Counselor Gibson"), observed the following on mental status exam: neat and clean appearance; motor activity appropriate to situation; cooperative attitude; appropriate affect; happy mood; normal rate and tone of speech; normal, appropriate, coherent, and relevant thought process; normal thought content; no evidence of hallucinations or delusions; alert and oriented to person, place, time, and situation; usually able to make sound decisions; acknowledges and understands problems/illness; intact memory; easily distracted concentration and calculations; and average fund of knowledge. Tr. at 454. She assessed major depressive disorder ("MDD"), moderate, recurrent episode and recommended individual therapy. Tr. at 454, 456.

On May 31, 2016, Counselor Gibson noted Plaintiff was appropriately dressed, oriented times four, and demonstrated a happy mood and appropriate affect. Tr. at 457. She helped Plaintiff to identify goals and encouraged her to work on coping skills. *Id.*

On June 13, 2016, a second state agency medical consultant, Adrian Corlette, M.D. ("Dr. Corlette"), reviewed the record and concluded Plaintiff's physical RFC would impose the following restrictions: occasionally lift and/or

carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and avoid even moderate exposure to hazards. Tr. at 112–14, 124–26.

On June 14, 2016, Counselor Gibson met with Plaintiff to work on her objective of decreasing her depression and anxiety to one day or less using coping skills. Tr. at 458. She described Plaintiff as well-dressed and oriented times four, but noted Plaintiff had a sad mood and incongruent affect, as she smiled while expressing pain over her recent break-up. *Id.* Counselor Gibson encouraged Plaintiff to practice coping exercises and to engage in activities with others. *Id.*

State agency consultant Kevin King, Ph.D. ("Dr. King"), reviewed the record and completed a psychiatric review technique on June 20, 2016. Tr. at 110–11, 122–23. He considered Listing 12.04 for affective disorders and assessed a mild degree of impairment in restriction of activities of daily living ("ADLs"), maintaining social functioning, and maintaining concentration, persistence, or pace. *Id.*

On June 28, 2016, Counselor Gibson helped Plaintiff to identify triggers to suicidal thoughts and to incorporate positive activities to boost her mood. Tr. at 459. She described Plaintiff as well-dressed, oriented times four, and demonstrating a depressed mood and tearful affect. *Id.* Plaintiff reported

excessive drinking and indicated she had felt suicidal during the prior week. *Id.* She admitted she had an alcohol problem and agreed to obtain services to address her alcohol addiction. *Id.*

On July 20, 2016, Plaintiff presented to psychiatrist Gariane Gunter, M.D. ("Dr. G. Gunter"), for an initial medication assessment. Tr. at 460. Dr. G. Gunter indicated she had previously assessed Plaintiff and prescribed Wellbutrin XL and Wellbutrin SR to address suicidal thoughts. *Id.* Plaintiff endorsed intrusive thoughts regarding her grandmother's illness and death, disrupted sleep with nightmares, and avoidance with social isolation. *Id.* She indicated she had self-medicated with alcohol in the past, but was receiving treatment and attending Alcoholics Anonymous ("AA") meetings. *Id.* Plaintiff endorsed a positive response to Wellbutrin XL, indicating her depressive symptoms had improved and she was no longer experiencing suicidal thoughts. *Id.* Dr. G. Gunter prescribed Seroquel for sleep and mood. *Id.* She diagnosed MDD, recurrent episode, moderate, and posttraumatic stress disorder ("PTSD"). Tr. at 461.

On July 26, 2016, Counselor Gibson described Plaintiff as appropriately dressed, oriented times four, and demonstrating a happy mood and appropriate affect. Tr. at 462. Plaintiff reported decreased depression and anxiety as a result of engaging in more enjoyable activities. *Id.*

On August 12, 2016, Counselor Gibson described Plaintiff as appropriately dressed and oriented times four with a happy mood and appropriate affect. Tr. at 463. She reported doing well with alcohol abuse treatment and attending AA regularly, but expressed some frustration and hurt related to her relationship with her mother. *Id.*

On August 16, 2016, Dr. G. Gunter and Counselor Gibson provided a letter addressing Plaintiff's diagnoses and ability to work. Tr. at 429.

On August 26, 2016, Counselor Gibson indicated Plaintiff presented as appropriately dressed and oriented times four with a happy mood and appropriate affect. Tr. at 464. She worked with Plaintiff to identify thought distortions and practice coping skills. *Id.*

Plaintiff followed up with Laketa D. Riley, APRN ("NP Riley"), for results of a mammogram on August 30, 2016. Tr. at 433. NP Riley observed Plaintiff to ambulate normally with intact gait and to demonstrate a normal mood. Tr. at 434. She explained to Plaintiff that the ultrasound of her breast showed scattered areas of fibroglandular density, but was negative for any cancerous mass. Tr. at 435. She encouraged Plaintiff to take 100 units of Vitamin E four times a day and to decrease her caffeine intake. *Id.*

Plaintiff presented to NP Riley with back pain on September 21, 2016. Tr. at 436. She endorsed muscle aches and back pain, but denied arthralgias/joint pain. Tr. at 438. NP Riley observed Plaintiff to ambulate

normally with normal gait, to demonstrate a normal mood, to show normal movement of all extremities, and to have no malalignment, tenderness, or bony abnormalities in her spine. *Id.* She prescribed Ultram 50 mg. *Id.*

On September 23, 2016, Counselor Gibson noted Plaintiff presented as appropriately dressed and oriented times four with a happy mood and appropriate affect. Tr. at 465. Plaintiff indicated she was establishing boundaries with her mother and ex-girlfriend. *Id.* She agreed to attend a grief group to address the loss of her grandmother. *Id.*

Plaintiff presented to Amit Singh, D.O. ("Dr. Singh"), for back pain on September 29, 2016. Tr. at 440. She complained of pain in her lower back that radiated into her buttocks and caused tingling in her toes. *Id.* She stated the pain occurred intermittently and described it as "stabbing, shooting, burning, throbbing, sharp, tingling, and aching." *Id.* She indicated her pain was exacerbated by cleaning and prolonged sitting or standing. *Id.* Dr. Singh observed Plaintiff to demonstrate a nonantalgic gait, slightly forward-flexed posture upon standing, generalized tenderness to palpation in the lumbar region, decreased flexion and extension of the lumbar spine due to pain, 5/5 motor strength in the bilateral lower extremities, and decreased sensation in a nondermatomal distribution in the bilateral lower extremities. Tr. at 441. He reviewed a compact disc that contained images from a 2015 MRI of

Plaintiff's lumbar spine.[2] Tr. at 442. He stated the MRI showed a central L5–S1 disc protrusion and broad-based disc bulge at the L4–5 level. *Id.* He indicated the MRI findings were likely contributing to Plaintiff's symptoms, but did not explain the totality of her symptoms. *Id.* He stated most of Plaintiff's symptoms appeared to be myofascial in nature and indicated she seemed to have no neurological deficits or true radicular symptoms. *Id.* Dr. Singh diagnosed low back pain and myalgia. *Id.* He recommended physical therapy and possible intralaminar ESI and prescribed Gabapentin 100 mg. *Id.*

On October 13, 2016, Plaintiff reported she was attending substance abuse treatment three times a week and AA once or twice a week. Tr. at 466. She complained of a couple of weeks of decreased energy and increased sleep, but endorsed stable mood overall. *Id.* Dr. G. Gunter indicated the following on mental status exam: appearance within normal limits; cooperative attitude; calm behavior; normal speech; logical/goal-directed thought process; denies suicidal ideation; denies homicidal ideation; euthymic mood; and appropriate affect. *Id.* She continued Plaintiff's medications at the same doses and instructed her to follow up in three months. *Id.*

Dr. G. Gunter and Counselor Gibson completed a mental RFC assessment on October 31, 2016. Tr. at 443–46.

---

[2] The 2015 MRI report is absent from the record before the court.

On November 2, 2016, Counselor Gibson observed Plaintiff to present as appropriately dressed and oriented times four and to demonstrate a happy mood and appropriate affect. Tr. at 469. Plaintiff reported regularly spending time with friends and engaging in activities outside her house. *Id.* She indicated her depression and anxiety had decreased, but she continued to feel overwhelmed on some days. *Id.* Counselor Gibson mentioned the possibility of completing therapy and transitioning to medication management only beginning in January, and Plaintiff indicated her approval. *Id.*

Plaintiff participated in group therapy sessions to address grief on November 8, 15, 22, and 29 and December 13, 2016. Tr. at 470.

Counselor Gibson observed Plaintiff to present as appropriately dressed and oriented times four with a happy mood and appropriate affect on December 21, 2016. Tr. at 484. Plaintiff reported she was positively addressing her stressors. *Id.* She established maintaining her sobriety as a new treatment objective. *Id.*

On January 10, 2017, Counselor Gibson observed Plaintiff to demonstrate a happy mood and appropriate affect and to be appropriately dressed and oriented. Tr. at 485. Plaintiff indicated she was experiencing "happy days" much more frequently and was using coping skills daily to manage stress and maintain sobriety. *Id.*

Plaintiff also followed up with Dr. G. Gunter on January 10, 2017. Tr. at 486. She indicated she had discontinued Trazodone because it had caused her to wake during the night in a sweat and with a desire to eat. *Id.* She endorsed a stable mood. *Id.* Dr. G. Gunter discontinued Trazodone and recommended Plaintiff take two Neurontin tablets at bedtime for sleep. *Id.*

On January 24, 2017, Plaintiff followed up with NP Riley for chronic back pain. Tr. at 476. She indicated she lacked insurance and was unable to afford to follow up with the spine clinic, physical therapy, or Dr. Counts. *Id.* She endorsed muscle aches and back pain, but reported no arthralgias or joint pain. *Id.* NP Riley observed Plaintiff to be overweight, to ambulate normally and with normal gait, to have no malalignment or bony abnormalities of her spine, to have no edema, to demonstrate normal movement of all extremities, and to endorse some tenderness in her neck and lower back. Tr. at 477. She refilled Plaintiff's prescriptions for Flexeril 10 mg and Naproxen 500 mg. *Id.*

Counselor Gibson observed Plaintiff to demonstrate a happy mood and appropriate affect on February 9, 2017. Tr. at 488. Plaintiff reported she had been sober for seven months and had severed contact with her ex-girlfriend. *Id.* She indicated she had been staying busy and was working to establish boundaries with her father and sister. *Id.*

Counselor Gibson described Plaintiff as presenting with a happy mood and appropriate affect on March 15, 2017. Tr. at 489. Plaintiff reported she had recently celebrated nine months of sobriety. *Id.* Counselor Gibson indicated she was transferring Plaintiff to medication management only, but encouraged her to resume therapy services if she needed additional help in the future. *Id.*

On April 3, 2017, Plaintiff reported muscle aches, back pain, and pain on her left side. Tr. at 479. NP Riley indicated Plaintiff was overweight, but noted no other abnormalities on exam. Tr. at 479–80.

On April 4, 2017, Plaintiff reported a recent dream about past abuse and family discord had caused her to have a difficult week. Tr. at 490. She indicated she continued to attend AA and had remained sober. *Id.* Dr. G. Gunter noted normal findings on a mental status exam. *Id.* She agreed with Counselor Gibson's decision to transfer Plaintiff to medication management only. *Id.* Plaintiff indicated she was pleased with her current medications, and Dr. G. Gunter continued them and advised Plaintiff to follow up in three months. Tr. at 490–91.

Plaintiff reported doing well with stable mood, fair sleep, and good appetite on June 27, 2017. Tr. at 492. Dr. G. Gunter indicated normal findings on mental status exam. *Id.* Plaintiff requested medication to help with sleep, and Dr. G. Gunter prescribed Amitriptyline. *Id.*

Plaintiff complained of sharp, tingling back pain that radiated to her legs on September 14, 2017. Tr. at 500. Amanda B. Driggers, APRN ("NP Driggers"), observed no tenderness in Plaintiff's lumbar spine, but noted limited flexion and extension. Tr. at 501. She encouraged Plaintiff to take medication as directed, to rest, and to slowly increase her activity level. *Id.* She prescribed Flexeril 10 mg and Naproxen 500 mg. *Id.*

On September 19, 2017, Plaintiff reported a recent period of lower mood as a result of relationship problems, but subsequent return to her baseline. Tr. at 494. She indicated she was doing well overall, continued to attend AA, and would soon celebrate 15 months of sobriety. *Id.* She reported Amitriptyline helped with sleep, but sometimes caused her to eat during the night. *Id.* Dr. G. Gunter noted normal findings on mental status exam. *Id.* She advised Plaintiff to take half a dose of Amitriptyline or to use it only as needed. Tr. at 495.

On December 7, 2017, Plaintiff complained of moderate, worsening back pain. Tr. at 504. She described it as sharp and tingling and indicated it radiated to her buttocks and legs and caused numbness and tingling in her legs and feet. *Id.* She reported her pain interfered with sleep and work and was exacerbated by movement/positioning, twisting, and flexing and extending her back. *Id.* NP Driggers observed the following: good judgment; active and alert mental status; normal mood; oriented to time, place, and

person; normal movement of all extremities; normal gait; normal sensation of bilateral feet and legs; normal bilateral straight-leg raise; spinal alignment within normal limits; limited flexion and extension; and tenderness to palpation of the spine. Tr. at 505. She discontinued Naproxen, prescribed Diclofenac Sodium, and increased Gabapentin from 100 mg to 300 mg twice a day. *Id.*

Plaintiff reported "doing okay overall" on December 14, 2017. Tr. at 518. She endorsed low mood and anxiety at times, but indicated she was trying to remain busy and avoid isolation. *Id.* She reported good sleep and appetite. *Id.* Dr. G. Gunter noted no abnormalities on mental status exam. *Id.* She increased Plaintiff's dose of Wellbutrin XL to 300 mg daily for mood benefits and to assist with smoking cessation. *Id.*

On January 5, 2018, Stacey Bulfinch Idica, ANP ("NP Idica"), wrote a letter to Plaintiff's attorney indicating she had evaluated Plaintiff for chronic low back pain with radiculopathy on December 21, 2017. Tr. at 517. She opined Plaintiff was limited to standing less than 30 minutes and walking fewer than three blocks without resting. *Id.* She indicated Plaintiff was able to cook simple meals and groom herself, but was limited in her ability to perform household chores. *Id.* She indicated lifting caused Plaintiff discomfort and irritation. *Id.* NP Idica stated Plaintiff was unable to return to work due to physical limitations and was limited in her ability to obtain

medical care because of a lack of insurance and money. *Id.* She stated Plaintiff's low back pain increased with limited ROM on physical exam. *Id.* She noted palpable muscle spasms at L4 and L5, positive straight-leg raise on the right at 30 degrees, sensation deficit in a right L5–S1 pattern, and weakness in Plaintiff's right quad muscle. *Id.* NP Idica stated:

> It is my medical opinion that she is limited in the ability to work at a job sitting or standing due to chronic pain and medication use. Side effects from her current medication regimen include: dizziness, sleepiness, ataxia, fatigue, emotional lability, impaired ability to make decisions. I recommend further treatment with neurosurgery, but the lack of insurance limits her ability to seek further treatment.

*Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on January 31, 2018, Plaintiff stated she lived in a mobile home with her 61-year old father. Tr. at 44–45. She described herself as 5'7" tall, weighing 150 pounds, and right-handed. Tr. at 45. She stated she was a high school graduate, had no history of military service, and had received a CNA certificate. *Id.* She said she had a driver's license without any restrictions, but that her father drove the 30 minutes to the hearing. Tr. at 45–46. She testified she typically left her home three times a week for outings, which included attending AA meetings once or twice a week,

shopping for groceries, and paying bills or completing other errands for her father. Tr. at 46–47. Plaintiff said she used a cart to shop for groceries for no more than 20 or 30 minutes. Tr. at 46. She denied involvement in any community activities, church, sporting events, or civic clubs. *Id.* She denied needing assistance with dressing or bathing, but said she struggled with bathing because her legs would tighten up. Tr. at 47. She said she prepared meals for herself and her father three to five times a week. *Id.* She also testified she did laundry two or three times a week, mopped and swept twice a week, washed dishes by hand two or three times a week, and rarely made her bed. Tr. at 47–48. She indicated her father cleaned the bathroom and took out the trash because she was unable to perform those activities. Tr. at 48. She said she used the internet for 30 minutes to an hour each day to check social media, email, and text. *Id.* She said her father handled her bills and supported her financially. Tr. at 48–49. She denied going outdoors to do yardwork or for pleasure or exercise like walking, fishing, hunting, or sports. Tr. at 49. She stated she filed a worker's compensation claim in 2012 and settled it for $9,000 in 2014. *Id.* She estimated being able to walk 20 to 30 minutes at a time and sit or stand for 20 minutes before her muscles tightened and caused back pain. Tr. at 49–50. She estimated she could lift eight to ten pounds and denied using a cane or walking stick or wearing a brace. Tr. at 50. She said she was employed at Michelin from 2010 to 2014,

but was out of work under the Family and Medical Leave Act beginning in March 2013. Tr. at 50–51. She described her job at Michelin as operating and loading a machine with materials needed to build a tire from a platform. Tr. at 51. She indicated this involved lifting 50 to 100 pounds while standing. Tr. at 51–52. Prior to Michelin, she said she worked from 2004 to 2009 as a mechanical assembler at Ansaldo STS. Tr. at 52. She indicated the job involved putting components together using hand tools and lifting 50 to 75 pounds. Tr. at 52–53. She noted she was laid off as part of a reduction in force. Tr. at 53.

Plaintiff testified she injured her low back in 2012 and had surgery after severe left leg and back pain. Tr. at 54. She said she returned to work after her surgery and developed problems with numbness and tingling and sharp and shooting pains in her right leg. Tr. at 54–55. She described the problems as continuing and worsening and described feeling as if the muscles in the right side of her back were being pinched in a vice grip. Tr. at 55. She stated she experienced daily pain since 2015 that radiated from the upper part of her right leg, down her calf and to her foot, causing numbness and tingling. Tr. at 56. She said she still had some tingling and numbness in her left leg, but indicated it was not as bad as the right leg. *Id.* She noted Dr. B. Gunter operated on only one level in her back because it was impinging the S1 root. Tr. at 56–57. She did not recall having any MRIs after her 2012

surgery despite having seen a spine specialist. Tr. at 57. She said her back and leg pain worsened with standing and any movement and she was uncomfortable sitting in a chair. Tr. at 57–58. She described taking medications for relief and lying down or reclining. *Id.* She said she would rest every day for three hours to reduce her lower back pain and leg pain. Tr. at 58–59. She stated she took 600 mg of Gabapentin two to three times a day for nerve pain, as well as Flexeril and Tramadol. Tr. at 59. She indicated the medications helped, but did not eliminate the pain or symptoms. Tr. at 60. She testified she took Flexeril because she felt like she was having daily muscle spasms or cramps in her leg and the right side of her lower back. Tr. at 60. She noted side effects of her medications included fatigue, drowsiness, lightheadedness, constipation, and diarrhea. Tr. at 60–61. Plaintiff testified she had felt joint pain in her neck and hands for at least a year, but had not had any treatment for it. Tr. at 61–62. She stated she started seeing Dr. Driggers at Waverly Women's Health Clinic because she could not afford to continue seeing Dr. Counts. Tr. at 62. She stated her bladder would leak if she sat for 20 to 30 minutes. Tr. at 62–63. She said she had mentioned it to her doctor, but was too embarrassed to discuss it in detail. Tr. at 63. She denied wearing adult diapers, but said she tried to stay near a bathroom and changed underwear frequently. Tr. at 63–64. She acknowledged being recently diagnosed with tachycardia, which caused her shortness of breath

and chest pain. Tr. at 64. She admitted she still smoked, but testified she had decreased to half a pack a day and had talked to her doctor about stopping. Tr. at 64–65.

Plaintiff testified she had some "rough times in the past" and had been treated at the mental health clinic for mental problems that included depression, anxiety, nightmares, crying spells three to five times a week, and lack of motivation. Tr. at 65–66. She indicated she experienced these symptoms at least five times during the week. Tr. at 65. She said she felt sad, was not motivated to do anything, had difficulty concentrating, experienced memory loss, felt anxious, had racing thoughts, and felt on edge. Tr. at 65–66. She said she isolated herself in her room. Tr. at 66–67. She estimated having nightmares three to five times a week, with flashbacks five times a week. Tr. at 67. She said Wellbutrin provided some relief and Amitriptyline helped her sleep, but she continued to have difficulty falling and staying asleep due to partially to her mental issues and primarily to her back and leg pain. Tr. at 67–68. She said she used a heating pad and ice pack every other day for 10 to 15 minutes to help with the back and leg pain. Tr. at 68–69. She stated she had previously seen NP Idica at her attorney's request in late-2017 and hoped to be able to afford to see her in the future. Tr. at 69. Plaintiff denied being able to sit and stand in combination throughout an eight-hour workday. Tr. at 69–70. She denied being able to focus to do one, two, three, or

four simple tasks during an eight-hour workday. Tr. at 70. She testified she could not go without taking her pain medications. *Id.* She testified she began seeing a counselor in April or May 2016, which helped some. Tr. at 70–71. She said she had been sober since July 5, 2016. Tr. at 71. She acknowledged having seen a psychotherapist in Lexington sporadically between 2008 and 2015 prior to switching to the mental health clinic due to cost. *Id.* She conceded she might have gone two or three months without seeing the psychotherapist. Tr. at 72. Plaintiff testified she was diagnosed with depression and anxiety. *Id.* She said that she did not think she could work a job because she needed to be able to lie down to take the pressure off her lower back and legs. Tr. at 72–73. She said her doctors had mentioned another ESI or possible surgery, but she lacked insurance and could not afford care. Tr. at 73. She said she had received an ESI prior to surgery, but it did not help. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") William Stewart, Ph.D., reviewed the record and testified at the hearing. Tr. at 74–82. The VE categorized Plaintiff's PRW as (1) a tire molder, requiring heavy exertion with a specific vocational preparation ("SVP") of 3, *Dictionary of Occupational Titles* ("*DOT*") No. 553.685-102; (2) a production line assembler, requiring medium exertion as described in the *DOT*, but heavy exertion as performed, with an SVP of 3,

*DOT* No. 809.684-010; and (3) a material handler, requiring heavy exertion with an SVP of 3, *DOT* No. 929.687-030. Tr. at 75–76, 79.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work, frequently climb ramps or stairs, occasionally climb ladders, ropes, or scaffolds, frequently stoop, and occasionally kneel, crouch, or crawl, but could not work at unprotected heights or around unprotected, dangerous, moving mechanical parts. Tr. at 77. The VE testified the hypothetical individual could not perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. Tr. at 80. The VE identified the following positions: (1) inspector, requiring sedentary exertion with an SVP of 2, *DOT* No. 726.684-050; (2) assembler, requiring sedentary exertion with an SVP of 2, *DOT* No. 713.683-018; and (3) weight tester, requiring sedentary exertion with an SVP of 2, *DOT* No. 539.485-010, with 91,000, 126,000, and 12,000 positions available nationally, respectively. *Id.*

The ALJ provided a second hypothetical that modified the first to limit the individual to simple, routine tasks, defined as tasks that could be learned in one month or less with on-the-job demonstration; limited the individual's use of judgment to simple, work-related decisions involving no more than a few variables; and limited to the individual to tolerating only a few changes

29

in a routine work setting, defined as no more than a few deviations from the core job duties. Tr. at 80–81. The VE testified the modifications would not affect the availability of the jobs cited. Tr. at 81. Similarly, if the individual needed to stand five minutes every hour at the workstation, the same jobs would be available. Tr. at 81–82. The VE testified there would be no work available for an individual who was absent more than one day per month or 15% of the time. Tr. at 81.

## 2. The ALJ's Findings

In her decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2019. (Ex. 6D).
2. The claimant has not engaged in substantial gainful activity since the amended alleged onset date of July 3, 2015. (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3. The claimant has the following severe impairments: lumbar degenerative disc disease; moderate recurrent episode of a major depressive disorder; and post-traumatic stress disorder. (20 CFR 404.1520(c) and 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can frequently climb ramps or stairs, and stoop. She can occasionally climb ladders, ropes, or scaffolds; kneel; crouch; or crawl. The claimant should never work at unprotected heights or around unprotected, dangerous moving mechanical parts. She is limited to the performance of

simple, routine tasks, which are defined as tasks than can be learned in one month or less with just an on the job demonstration. Her use of judgment is limited to simple work-related decisions, which are defined as decisions involving no more than a few variables. She is limited to tolerating few changes in a routine work setting, which is defined as no more than a few deviations from the core job duties. The claimant may need to stand for five minutes every hour at the workstation.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on March 24, 1986 and was 26 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from July 3, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 12–25.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to properly weigh Plaintiff's treating psychiatrist's opinion;

2)    the ALJ mischaracterized anxiety disorder as a non-severe impairment and neglected to consider it in assessing Plaintiff's RFC;

3) the ALJ did not adequately consider Plaintiff's allegations as to pain, mental limitations, and side effects of her medications; and

4) the Appeals Council erred in failing to consider results of an MRI of Plaintiff's lumbar spine dated May 10, 2018.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial

gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a

party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Treating Psychiatrist's Opinions

On August 16, 2016, Dr. G. Gunter and Counselor Gibson provided a letter addressing Plaintiff's impairments and work-related abilities. Tr. at 429. They wrote the following:

> Please accept this letter as further support and justification of Ms. Joanie Rankin's Social Security disability income. Ms. Rankin . . . is diagnosed with 296.32 Major depressive disorder and 309.81 Posttraumatic stress disorder. In our clinical opinion, Ms. Rankin would have difficulty maintaining employment due to symptoms of her mental illnesses. Per our observation and Ms. Rankin's feedback, she had had difficulty with maintaining mood stability, anxiety management, and difficulty with interacting with others (especially any criticism or negative interactions from customers). In our opinion, it is likely that it would be very difficult for Ms. Rankin to maintain gainful employment for the foreseeable future.

*Id.*

On October 31, 2016, Dr. G. Gunter and Counselor Gibson completed a mental residual functional capacity assessment. Tr. at 443–46. They indicated the evidence suggested Plaintiff had no limitation as to the following abilities: remembering locations and work-like procedures; understanding and remembering very short and simple instructions; understanding and remembering detailed instructions; carrying out very short and simple instructions; sustaining an ordinary routine without special supervision; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically-based

symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintaining socially-appropriate behavior; adhering to basic standards of neatness and cleanliness; being aware of normal hazards and taking appropriate precautions; traveling in unfamiliar places or using public transportation; and setting realistic goals and making plans independently of others. *Id.* Dr. G. Gunter and Counselor Gibson defined "moderately limited" as being "off task" 10% of the time when performing the mental activity." Tr. at 443. However, they did not assess Plaintiff's abilities as "moderately limited" in any area. *See* Tr. at 443–46. They indicated Plaintiff would be markedly limited as to the following abilities: to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; and to respond appropriately to changes in the work setting. *Id.* They explained as follows: "[Plaintiff] experiences depressive moods and a lack of ability to concentrate.

This affects her ability to deal with change appropriately and stay on task." Tr. at 446.

Plaintiff argues the ALJ erred in weighing Dr. G. Gunter's opinions. [ECF No. 12 at 14]. She maintains the ALJ erroneously concluded Dr. G. Gunter's opinion supported the assessed RFC. *Id.* at 15–16; ECF No. 17 at 3–4. She contends Dr. G. Gunter's records support her opinion. *Id.* at 16; ECF No. 17 at 1–3.

The Commissioner argues substantial evidence supports the ALJ's allocation of partial weight to Dr. G. Gunter's opinion. [ECF No. 13 at 15]. He maintains the October 31, 2016 opinion was supported by the treatment notes and was consistent with the assessed RFC. *Id.* at 16–17. He contends the ALJ rejected Dr. G. Gunter's May 31, 2016 opinion because it was not supported by treatment notes from visits in and around the date it was provided. *Id.* at 17–18.

The applicable regulations direct ALJs to give controlling weight to treating physicians' medical opinions that are well supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[5] "[T]reating physicians are given 'more weight .

---

[5] Effective March 27, 2017, the Social Security Administration rescinded SSR 96–2p, and it no longer applies the "treating physician rule." Rescission of SSR 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15,263 (March 27, 2017); 20 C.F.R.

. . since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone[.]'" *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).

If a treating physician's opinion is not well supported by medically-acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence of record, the ALJ may decline to give it controlling weight. SSR 96-2p, 1996 WL 374188, at *2 (1996). However, the ALJ's assessment of the treating physician's opinion does not end with the finding that it is not entitled to controlling weight. *Johnson*, 434 F.3d at 654; SSR 96-2p, 1996 WL 374188, at *4 (1996). The ALJ must weigh the treating physician's opinion, in addition to all other medical opinions of record, based on the factors in 20 C.F.R. § 404.1527(c) and 416.927(c), which include "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability

§§ 404.1520c, 416.920c (2017). The court reviews the ALJ's decision under the old rules codified by 20 C.F.R. §§ 404.1527 and 416.927 because the new regulation is not retroactive and Plaintiff filed her claim before it took effect. *See* 82 Fed. Reg. 15,263 (stating the rescissions of SSR 96-2p, 96-5p, and 06-3p were effective for "claims filed on or after March 27, 2017"); *see also* 20 C.F.R. §§ 404.1520c, 416.920c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 [and § 416.927] apply").

of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527).

"[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2011) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). However, if the ALJ issues a decision that is not fully favorable, her decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." SSR 96-2p, 1996 WL 374188, at *5 (1996). The ALJ must "always give good reasons" for the weight she accords to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The court should not disturb an ALJ's determination "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

The ALJ accorded little weight to Dr. G. Gunter's August 16, 2016 opinion, explaining:

[T]heir treatment records up to that time do not support this opinion as these records generally showed the claimant to have a happy mood and affect. (Ex. 14F at 10, 11, 16). The claimant did present with a sad affect at some appointments since starting therapy in April of 2016, but by July 2016, she reported that she was doing better and had decreased her depression and anxiety by spending time with friends, going to Alcoholics Anonymous meetings, and staying busy. (Ex. 14F at 10–16). Indeed, at the appointment four days before this opinion was rendered, the claimant had a happy mood and affect and was doing well. (Ex. 14F at 17). Because Ms. Gibson's and Dr. Gunter's own treatment records do not support the limitations they opined, their opinion is given little weight. Additionally, to the extent that Ms. Gibson and Dr. Gunter opined the claimant's mental impairments would make it difficult to find gainful employment, this is a decision of disability reserved to the Commissioner and is not persuasive in articulating a more restrictive finding. (20 CFR 404.1527; 20 CFR 404.927).

Tr. at 22.

The ALJ gave partial weight to Dr. G. Gunter's October 31, 2016 opinion, noting:

They opined that the claimant would be off task 10 percent of the time when performing mental activities. Further, they opined that the claimant had marked limitations to carrying out detailed instructions; maintaining concentration, persistence, and pace for extended periods; adhering to a regular schedule; working around others without distraction and responding appropriately to changes in the work setting. (Ex. 13F). This opinion is somewhat supported by the distractibility and fatigue noted at intake to treatment, as well as the claimant's occasional presentation with sad mood and incongruent or blunted affect (See, e.g., Ex. 14F at 8, 12), but no psychological testing of the claimant's memory, concentration, or mental aptitudes by Ms. Gibson or Dr. Gunter is apparent from the record (Ex. 14F, 16F, 19F). They did, however, indicate that the claimant's depressive moods and lack of ability to concentrate affected her ability to deal with change and stay on task. (Ex. 13F). As the claimant's mental health care providers, Ms. Gibson and Dr. Gunter were able to observe and

document the claimant's behavior and any symptoms from her mental impairments, such as impaired concentration. This uniquely enabled them to monitor the efficacy of treatment efforts, progression of the claimant's symptoms at her therapy sessions and medication management appointments. Moreover, this opinion supports the residual functional capacity limitation to simple, routine tasks, simple work-related decisions, and work with few changes in the routine work setting. Because the record is somewhat supportive of this opinion and because it is based upon observations noted over seven months of treatment, it is given partial weight.

*Id.* She further explained the mental limitations in the RFC assessment were "supported, in part, by the October 31, 2016 opinion of Ms. Gibson and Dr. G. Gunter as well as the distractibility and fatigue noted at her treatment sessions and her occasional presentation with sad mood and incongruent or blunted affect, but with grossly normal mental status examinations and regularly happy moods." Tr. at 23 (citing Ex. 6F at 9; 11F at 3, 7; 13F; 14F at 8, 12; 16F at 2–8).

The ALJ cited substantial evidence to support her decision not to give controlling weight to Dr. G. Gunter's opinions. She adequately explained that Dr. G. Gunter's and Counselor Gibson's treatment notes did not reflect findings that wholly supported the restrictions Dr. G. Gunter endorsed. *See id.*

The ALJ also relied on substantial evidence to support her decision to give little weight to Dr. G. Gunter's August 2016 opinion and partial weight to her October 2016 opinion, as her decision reflects consideration of all

relevant factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c). In accordance with 20 C.F.R. §§ 404.1527(c)(1), (2), 416.927(c)(1), (2), the ALJ explicitly considered the examining and treating relationship between Plaintiff and Dr. G. Gunter. *See* Tr. at 22. Elsewhere in the decision, she acknowledged Plaintiff established mental health treatment in late-April 2016 and attended monthly therapy until she became stable overall, "having a lot more happy days," and graduated to medication management every three months in April 2017. Tr. at 19. The ALJ considered the supportability of Dr. G. Gunter's opinion in her records and those of Counselor Gibson, in accordance with 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3), and found Dr. G. Gunter's opinion was not entirely supported by those records. *See* Tr. at 19. (noting Plaintiff was observed to be easily distracted and fatigued and to have sad mood, incongruent and blunted affect, and passing suicidal ideation during some visits, but obtained a score on a depression assessment in December 2017 suggestive of mild depression and generally had normal or happy mood and affect, was alert and oriented, demonstrated normal insight and memory, and expressed primarily situational depression related to a breakup and the loss of her job and house). As required by 20 C.F.R. § 404.1527(c)(4) and § 416.927(c)(4), earlier in the decision, the ALJ considered the consistency of the restrictions Dr. G. Gunter endorsed with the other evidence of record, noting some inconsistencies. *See* Tr. at 19–20 (indicating "[t]he providers

treating [Plaintiff's] physical conditions . . . generally noted normal mood and affect" and referencing Plaintiff's reports of her symptoms and ADLs). Finally, the ALJ recognized Dr. G. Gunter's specialization as a psychiatrist. *See* Tr. at 19 (indicating Plaintiff's "psychiatrist generally noted that the claimant had a euthymic or a happy mood and affect" and referencing her "psychiatrist's" conclusion that she was "stable overall" after about nine months of therapy and her "most recent follow up with her psychiatrist") (citing 16F 4, 5, 11 and 19F) (corresponding to Dr. G. Gunter's treatment notes)).

Contrary to the ALJ's assertion, Tr. at 22, Dr. G. Gunter did not opine that Plaintiff would be off-task 10% of the time when performing mental functions. Dr. G. Gunter defined "moderately limited" as being "'off task' 10% of the time when performing the mental activity," but declined to assess moderate limitation as to any particular mental activity. Tr. at 443. Although the ALJ erred in her interpretation of Dr. G. Gunter's opinion in this respect, her error was harmless. An ALJ's error is generally considered to be harmless where she "conducted the proper analysis in a comprehensive fashion," "cited substantial evidence to support [her] finding," and would have unquestionably "reached the same results notwithstanding [her] initial error." *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994). Although the ALJ misstated Dr. G. Gunter's opinion as to time off-task, her error did not affect

her analysis, as evidenced by her acknowledgment of Dr. G. Gunter's assessment of marked limitations in several areas and her citation of substantial evidence to support her conclusion as to the mental restrictions imposed by Plaintiff's impairments. *See* Tr. at 19–20, 22.

Plaintiff disputes the ALJ's assertion that the RFC assessment is supported by Dr. G. Gunter's October 2016 opinion. While Plaintiff correctly points to differences between the marked limitations assessed by Dr. G. Gunter and the RFC assessment, the ALJ's allocation of partial, as opposed to controlling, weight to the opinion explains the discrepancies. The ALJ explained Dr. G. Gunter's and Counselor Gibson's "cumulative observations of the claimant's symptoms at her therapy sessions and medication management appointments," including notations of "distractibility and fatigue" and "occasional presentation with sad mood and incongruent or blunted affect" supported the RFC for "simple, routine tasks, simple work-related decision, and work with few changes in the routine work setting." Tr. at 22. Moreover, the RFC assessment appears to be consistent with Dr. G. Gunter's opinion that Plaintiff had no limitation remembering locations and work-like procedures, understanding and remembering very short and simple instructions, carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, making simple work-related decisions, completing a normal workday and workweek without interruptions

from psychologically-based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the general public, asking simple questions or requesting assistance, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintaining socially-appropriate behavior, adhering to basic standards of neatness and cleanliness, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places or using public transportation, and setting realistic goals and making plans independently of others. *See* Tr. at 443–46.

In light of the foregoing, the court finds substantial evidence supports the ALJ's weighing of Dr. G. Gunter's opinion.

### 2. Anxiety Disorder

Plaintiff argues the ALJ erred in failing to consider anxiety disorder among her severe impairments and in declining to address it in assessing her RFC. [ECF No. 12 at 19–20]. She maintains the ALJ is required pursuant to SSR 85-16 to consider all mental impairments in assessing the RFC and the absence of a diagnosis from an acceptable medical source does not absolve the ALJ of this responsibility. [ECF No. 17 at 4–6].

The Commissioner claims the ALJ did not err, as none of Plaintiff's medical providers diagnosed an anxiety disorder. [ECF No. 13 at 13–14]. He

further contends Plaintiff has not established that her alleged anxiety disorder imposes any symptoms in addition to those associated with MDD and PTSD. *Id.* at 14. He maintains the ALJ considered Plaintiff's allegations of anxiety in assessing her RFC. *Id.* at 14–15.

Pursuant to 20 C.F.R. §§ 404.1521 and 416.921, "a physical or mental impairment must be established by objective medical evidence from an acceptable medical source." If the evidence establishes the existence of a medically-determinable impairment, the ALJ should assess its severity. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); SSR 96-3p.

The ALJ's recognition of a single severe impairment at step two ensures that she will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ neglected to find an impairment to be severe at step two provided that she considered that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting

cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

Pursuant to 20 C.F.R. §§ 404.1521 and 416.921, the absence of a diagnosis of anxiety disorder does not prevent a finding that Plaintiff had a severe impairment of anxiety disorder. However, Plaintiff's statements of symptoms are also insufficient to establish anxiety as a severe impairment. Part A of Listing 12.06 references the following clinical signs of anxiety disorder: restlessness; easily fatigued, difficulty concentrating, irritability, muscle tension, and sleep disturbance. 20 C.F.R. Pt. 404, Subpt. P, App'x. 1, §12.06. Although the record contains notations of impaired concentration (Tr. at 446, 454) and increased sleep disturbance (448, 451, 460), it is not clear whether these symptoms are related to a separate diagnosis of anxiety disorder or to the diagnosed impairments of MDD and PTSD, which the ALJ acknowledged as severe impairments in her opinion. In addition, Plaintiff testified her sleep disturbance was primarily related to her pain. *See* Tr. at 67–68. Given little objective evidence to support a diagnosis of anxiety disorder and Plaintiff's psychiatrist's failure to assess the diagnosis, the court is reluctant to find the ALJ erred in failing to assess anxiety disorder as a severe impairment.

In addition, the ALJ considered anxiety-related symptoms in rating the degree of limitation imposed by Plaintiff's mental impairments and in

evaluating her RFC. The ALJ assessed moderate limitation in concentrating, persisting, or maintaining pace, noting her "therapist indicated that the claimant was easily distracted" and that "[a] fatigued energy level has also been noted." *See* Tr. at 14. She acknowledged Plaintiff's allegation that she was disabled due to anxiety, among other impairments. *See* Tr. at 16. Although the ALJ found the record supported "a finding of functional limitations due to the claimant's depression and post-traumatic stress disorder," she specifically acknowledged treatment notes showed Plaintiff to be "easily distracted and fatigued," reflecting her consideration of the symptoms consistent with anxiety disorder. Tr. at 19. The ALJ concluded Plaintiff's symptoms "restrict[ed] her to the performance of simple, routine task, simple work-related decisions, and work with few changes in the routine work setting," but did not support additional limitations, as they had improved with medication and treatment. Tr. at 19–20. Given the ALJ's consideration of anxiety-related symptoms in evaluating her degree of functional limitation and RFC, the court finds no error.

### 3. Allegations as to Pain, Mental Limitations, and Side Effects from Medications

Plaintiff argues the ALJ erred in rejecting her allegations and declining to include additional restrictions in the RFC assessment to address the side effects of her medications. [ECF Nos. 12 at 20–23, 17 at 6–7]. She maintains the ALJ mischaracterized her ADLs and erroneously concluded they were

inconsistent with her allegations. *Id.* at 25–26. She contends the ALJ did not account for evidence of her difficulty staying on task in the RFC assessment. *Id.* at 27–29; ECF No. 17 at 9–12.

The Commissioner argues the ALJ considered the whole record, including Plaintiff's subjective allegations of pain, mental restrictions, and side effects of medications. [ECF No. 13 at 19–21]. He maintains the ALJ specifically considered the amount of time Plaintiff would be off task in questioning the VE. *Id.* at 26.

"Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. §§ 404.1529(b), (c), 416.929(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. §§ 404.1529(b), 416.929(b)). "Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)). The second determination requires the ALJ to consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the plaintiff's] statements and the rest of the evidence, including

[her] history, the signs and laboratory findings, and statements by [her] treating or nontreating source[s] or other persons about how [her] symptoms affect [her]." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). "Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ is to "carefully consider any other information" about the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

In evaluating the claimant's symptoms, the ALJ is to "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6. "Other evidence that [the ALJ should] consider includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." *Id.* at *5; *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (listing factors to consider, such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; treatment an individual receives or has received for relief of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms).

Pursuant to SSR 16-3p, the ALJ is to "explain which of an individual's symptoms [she] found consistent or inconsistent with the evidence in his or her record and how [her] evaluation of the individual's symptoms led to [her] conclusions." *Id.* at *8. She must evaluate the "individual's symptoms considering all the evidence in his or her record." *Id.*

The ALJ specifically acknowledged Plaintiff "testified that her medications help her pain, but cause drowsiness, lightheadedness, constipation, diarrhea, and fatigue." Tr. at 16. Although Plaintiff argues the ALJ erred in failing to consider drowsiness in the RFC assessment, the ALJ specifically noted that she had accounted for drowsiness caused by Plaintiff's medications "in the restriction barring her from exposure to unprotected heights or unprotected, dangerous, moving mechanical parts." Tr. at 17. She considered and rejected Plaintiff's allegations of additional medication-related side effects, explaining:

> While she alleges a host of side effects due to her medication regimen, she has generally reported side effects only to her psychiatrist, but not to the providers managing her physical symptoms. Those reports included waking up sweating, waking with increased appetite, and eating in her sleep. She did report that she was afraid Neurontin might make her drowsy, but made no mention of lightheadedness, constipation, diarrhea, or fatigue. (See, e.g., Hearing; Ex. 16F at 4,12). She did, however, report that her medications helped her back pain. (Hearing; 17F at 9).

Tr. at 18. While Plaintiff argues drowsiness further reduced her RFC, she testified her medications did not cause her to fall asleep during the day. *See*

Tr. at 61 (stating she had trouble falling asleep during the day because of her back and leg pain). In light of the foregoing, substantial evidence supports the ALJ's conclusion that no additional restrictions were required to address medication-related side effects.

Contrary to Plaintiff's argument, the ALJ considered her ADLs, in addition to her reported limitations in performing them. The ALJ acknowledged Plaintiff's reported abilities to walk for 20 to 30 minutes at a time, stand for 20 minutes at a time, and sit for about 20 minutes and her description of "needing frequent breaks due to pain." Tr. at 16. She noted Plaintiff "testified that she spends three hours per day laying down or reclining to relieve her pain." *Id.* However, the ALJ concluded Plaintiff's statements were not entirely consistent with the medical evidence and other evidence in the record. *Id.* She cited Plaintiff's reported daily activities, which included regularly spending time with friends, attending AA meetings, participating in group therapy sessions, visiting the grocery store, running errands, driving, independently performing personal care, preparing meals up to five times a week, doing laundry two to three times a week, mopping and sweeping twice a week, washing dishes by hand two to three times a week, spending up to an hour a day on the internet, and walking and bathing her dog. Tr. at 14, 16, 18. Plaintiff does not argue, and the court's review fails

to yield, any inconsistency between her reported ADLs and those the ALJ discussed.

Pertinent to Plaintiff's argument that the ALJ neglected to consider her ability to remain on task, evaluation of a claimant's ability to concentrate, persist, or maintain pace requires consideration of her "abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(E)(3). Examples of this area of functioning include, but are not limited to, the following:

> [i]nitiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

*Id.*

In *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015), the court found the ALJ erred in assessing the plaintiff's RFC. *Id.* It stated "we agree with other circuits that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* The court explained that it was possible for the ALJ to find that the moderate concentration, persistence, or pace limitation did not affect the plaintiff's ability to work, but that

remand was required "because the ALJ here gave no explanation." *Id.* This court has interpreted the Fourth Circuit's holding in *Mascio* to emphasize that an ALJ must explain how she considered the claimant's limitation in concentration, persistence, or pace in assessing her RFC. *See Sipple v. Colvin*, No. 8:15-1961-MBS-JDA, 2016 WL 4414841, at *9 (D.S.C. Jul. 29, 2016), adopted by 2016 WL 4379555 (D.S.C. Aug. 17, 2016) ("After *Mascio*, further explanation and/or consideration is necessary regarding how Plaintiff's moderate limitation in concentration, persistence, or pace does or does not translate into a limitation in his RFC.").

Like the ALJ in *Mascio*, the ALJ assessed moderate limitations to Plaintiff's abilities to concentrate, persist, or maintain pace, Tr. at 14, but unlike the ALJ in *Mascio*, the ALJ explained the restrictions she included in the RFC assessment to address the limitations, as well as her reasons for declining to include additional restrictions. She stated that she accounted for Plaintiff's mental limitations "by restricting her to the performance of simple, routine tasks, simple work-related decisions, and work with few changes in the routine work setting," but that the evidence supported no additional limitations. Tr. at 19. In discussing the evidence, the ALJ noted Plaintiff "indicated that she could usually maintain her attention" and "described little or no limitation to following written or oral instructions, getting along with others, and adapting to changes or stress." Tr. at 16 (citing Hearing; Ex. 6E,

8E, 11E, 16E). She discussed Plaintiff's symptoms at the time she established mental health treatment and her symptoms during some treatment sessions. Tr. at 19. However, she also noted minimal clinical signs of mental health symptoms during multiple treatment visits and evidence of improvement with medication to the point of progressing to require medication management only. *Id.* She stated "[o]n the whole, the frequency with which the claimant was noted to have euthymic and happy moods as well as the documented good results with therapy, medication, and increased social interaction demonstrate that the claimant's mental impairments are not as limiting as she alleges." Tr. at 20. The ALJ acknowledged Dr. G. Gunter's opinion that Plaintiff's "lack of ability to concentrate affected her ability to deal with change and stay on task," but she gave only some weight to the opinion, finding the record supported an RFC for simple, routine tasks, simple work-related decisions, and work with few changes in the routine work setting. Tr. at 22. Because the ALJ explicitly considered and rejected the notion that Plaintiff's ability to stay on task was further impaired than reflected in the RFC assessment, substantial evidence supports her consideration of Plaintiff's moderate difficulties in concentrating, persisting, or maintaining pace.

In light of the foregoing, substantial evidence supports the ALJ's consideration of Plaintiff's subjective allegations in assessing her RFC.

4.    Evidence Submitted to Appeals Council

A May 10, 2018 MRI ("2018 MRI") of Plaintiff's lumbar spine showed disc desiccation and height loss at the L4–5 level with left hemilaminectomy, asymmetric disc bulge from the midline to the far-right lateral disc, moderate bilateral foraminal stenosis, and good decompression of the central canal. Tr. at 37. It indicated a large midline disc protrusion at the L5–S1 level, with underlying generalized bulge, no significant effect on the canal diameter, and moderate foraminal stenosis. *Id.*

Plaintiff argues the Appeals Council erred in declining to exhibit and consider the 2018 MRI report. [ECF No. 12 at 23]. She maintains that, although the MRI was performed after the hearing, its results are pertinent to her condition at the time of the hearing and consistent with the progressive worsening demonstrated in prior imaging studies. *Id.* at 23–24; ECF No. 17 at 8–9. She contends the 2018 MRI results are new and material because they demonstrate more significant objective findings than the ALJ credited in her decision. [ECF No. 17 at 7–8]. She claims the record could not have been provided to the ALJ prior to the hearing because she did not undergo the test until months after. *Id.* at 8.

The Commissioner argues the Appeals Council complied with the provisions of 20 C.F.R. §§ 404.970(a)(5) and 416.1570(a) in declining to consider the 2018 MRI results. [ECF No. 13 at 22]. He claims Plaintiff has

not shown "good cause" for failing to submit or inform the agency of the existence of the record prior to the hearing, as required pursuant to 20 C.F.R. §§ 404.970(b) and 416.1470(b). *Id.* at 22–23. He maintains the 2018 MRI report is not "new" or "material," as it was consistent with prior MRI findings in the record. *Id.* at 23.

If a claimant is dissatisfied with an ALJ's decision, she may request that the Appeals Council review it. 20 C.F.R. §§ 404.967, 416.1467. "The Appeals Council may deny or dismiss the request for review, or it may grant the request and either issue a decision or remand the case to an administrative law judge." *Id.* The Appeals Council will grant a claimant's request for review if:

(1)    There appears to be an abuse of discretion by the [ALJ];

(2)    There is an error of law;

(3)    The action, findings, or conclusions of the [ALJ] are not supported by substantial evidence;

(4)    There is a broad policy or procedural issue that may affect the general public interest; or

(5)    Subject to paragraph (b) of this section, the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.

20 C.F.R. §§ 404.970(a), 416.1470(a).

The Appeals Council will only consider additional evidence under paragraph (a)(5) if the claimant shows good cause for not informing the ALJ about or submitting the evidence prior to the hearing. 20 C.F.R. §§ 404.970(b), 416.1470(b). If the Appeals Council finds that the additional evidence the claimant submitted was not new, material, or related to the period on or before the hearing decision or that the claimant did not have good cause for failing to submit it prior to the hearing, it will send the claimant "a notice that explains why it did not accept the additional evidence" and will advise her of her right to file a new application. 20 C.F.R. §§ 404.970(c), 416.1470(c).

The Notice of Appeals Council Action addresses the 2018 MRI results as follows: "You submitted medical records from South Carolina Diagnostic Imaging dated May 10, 2018 (2 Pages). We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not exhibit this evidence." Tr. at 2.

Although the Commissioner argues Plaintiff did not have good cause for failing to submit the evidence in a timely manner, it does not appear the Appeals Council rejected the evidence for that reason. Instead, it seems the Appeals Council found the 2018 MRI results were not new and material to the ALJ's decision. Therefore, the court considers whether the Appeals

Council erred in concluding that there was no reasonable probability that the 2018 MRI results would have changed the outcome of the ALJ's decision.

"In reviewing the Appeals Council's evaluation of new and material evidence, the touchstone of the Fourth Circuit's analysis has been whether the record, combined with the new evidence, 'provides an adequate explanation of [the Commissioner's] decision.'" *Turner v. Colvin*, No. 0:14-228-DCN, 2015 WL 751522, at *5 (D.S.C. Feb. 23, 2015), citing *Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011) (quoting *DeLoatche v. Heckler*, 715 F.3d 148, 150 (4th Cir. 1983)). After reviewing new evidence submitted to the Appeals Council, the court should affirm the agency's decision where "substantial evidence support[ed] the ALJ's findings." *Meyer*, 662 F.3d at 707, citing *Smith v. Chater*, 99 F.3d 635, 638–39 (4th Cir. 1996). However, if a review of the record as a whole shows the new evidence supported the plaintiff's claim and was not refuted by other evidence, the court should reverse the ALJ's decision and find it to be unsupported by substantial evidence. *Id.*, citing *Wilkins v. Secretary, Department of Health and Human Services*, 953 F.3d 93, 96 (4th Cir. 1991). If the addition of the new evidence to the record does not allow the court to determine whether substantial evidence supported the ALJ's denial of benefits, the court should remand the case for further fact finding. *Id.*

The court concludes substantial evidence supports the ALJ's decision, even with the addition of the 2018 MRI results. Although the record does not contain the 2015 MRI report, the ALJ considered its results as interpreted by Dr. Singh to show "a broad-based bulge at L4/5 and a central bulge at L5/S1." Tr. at 17. The findings on the 2018 MRI report are generally consistent with Dr. Singh's interpretation of the 2015 MRI. Thus, the ALJ considered similar MRI findings in reaching her conclusion.

Although the ALJ credited MRIs and other imaging results, she cited a plethora of other evidence she considered inconsistent with a finding of disability, including an absence of objective signs on physical exams, medical opinions of record, Plaintiff's reports to her medical providers, and her ADLs. Because the record, combined with the 2018 MRI report, provides an adequate explanation of the Commissioner's decision, the court finds no error in the Appeals Council's evaluation of the evidence and considers remand unnecessary.

III. Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

February 12, 2020
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge